# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## MICHAEL VINCENT RICCO v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court of Henderson County**
**No. 07-013-2     Donald Allen, Judge**

---

**No. W2010-02626-CCA-R3-PC  - Filed November 29, 2011**

---

Michael Vincent Ricco ("the Petitioner") was convicted by a jury of rape of a child and aggravated sexual battery.  This conviction was affirmed on direct appeal.  The Supreme Court denied the Petitioner's application for permission to appeal.  See State v. Michael Vincent Ricco, No. W2008-00756-CCA-R3-CD, 2009 WL 2191872 (Tenn. Crim. App. July 23, 2009), perm. app. denied, (Tenn. Dec. 14, 2009).  The Petitioner filed for post-conviction relief, claiming that he was denied effective assistance of counsel at trial.  After an evidentiary hearing, the post-conviction court denied relief, and the Petitioner has appealed. After a thorough review of the record and the applicable law, we affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Chadwick R. Wood, Lexington, Tennessee, for the appellant, Michael Vincent Ricco.

Robert E. Cooper, Jr., Attorney General & Reporter; Brent C. Cherry, Senior Counsel; James G. Woodall, District Attorney General; Angela R. Scott, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Petitioner was tried on six counts of rape of a child and convicted by a jury of one count of rape of a child and one count of aggravated sexual battery.  The jury acquitted the

Petitioner on two counts, and the court declared a mistrial on the two remaining counts of rape of a child. The Petitioner was sentenced to eighteen years for rape of a child and ten years for aggravated sexual battery, to be served consecutively. The Petitioner's Motion for New Trial was denied, at which point he timely filed a notice of appeal. On appeal, the Petitioner's convictions were affirmed, and the Supreme Court denied the Petitioner's application for appeal. See State v. Michael Vincent Ricco, No. W2008-00756-CCA-R3-CD, 2009 WL 2191872 (Tenn. Crim. App. July 23, 2009), perm. app. denied, (Tenn. Dec. 14, 2009).

The Assistant Public Defender ("trial counsel") represented the Petitioner at every stage of the proceedings through the filing of the application for permission to appeal to the Tennessee Supreme Court. After his discretionary appeal was denied, the Petitioner filed for post-conviction relief, arguing that he received ineffective assistance of counsel at trial. Following an evidentiary hearing, the post-conviction court denied relief, concluding that the "Petitioner has failed to prove he was denied effective assistance of counsel or that trial counsel's performance was so deficient that it prejudiced the Petitioner's case." On appeal, the Petitioner argues that trial counsel: (1) failed to thoroughly investigate the sheriff's department's participation in the case before trial and (2) failed to communicate with the Department of Children's Services ("DCS") worker and the mother of the victim before calling them as witnesses for the defense.

*Proof at Trial*

The minor victim in this case, K.T.,[1] was six years old at the time of trial. The Petitioner was dating K.T.'s grandmother ("Grandmother") at this point in time. Grandmother testified that she began dating the Petitioner in March of 2006. K.T. testified about separate incidents of sexual abuse that occurred when she was approximately five years old and took place at the homes of Grandmother and the Petitioner. Regarding the incident at Grandmother's residence, K.T. testified that, on occasion, she would spend the night with Grandmother, who was dating the Petitioner at that time. K.T. stated that, on one particular occasion, she spent the night with Grandmother when the Petitioner also spent the night.[2] According to K.T., the Petitioner slept in the bed between her and Grandmother. K.T. testified that, at one point during the night, the Petitioner "put his hands behind [her] panties"

---

[1] In cases involving child sex offenses, it is the policy of this Court to refer to victims by their initials.

[2] There was no testimony to indicate that Mother was present when the incident at Grandmother's residence occurred. Mother stated at trial that she had lived with Grandmother for five years until June of 2006. However, Mother indicated that she lived with Grandmother again at the time of trial because Grandmother's health had declined.

and stuck "his fingers in [her] butt." She stated that Grandmother saw what happened and yelled at the Petitioner, which caused him to stop. On redirect examination, the State asked K.T. if the only incident Grandmother observed was the one in which the Petitioner stuck his hand down her panties. K.T. responded, "All my nana saw was him with his hands behind my panties and what he did to me and that's all she saw."

Grandmother also testified regarding this incident. She explained that she was between K.T. and the Petitioner, as opposed to K.T.'s account in which the Petitioner slept in the middle. According to Grandmother, she was partially asleep when she awoke and saw the Petitioner's hands in K.T.'s panties. She stated that when she confronted the Petitioner about the incident, he immediately removed his hand and told her, "I must have dozed off and thought it was you." Trial counsel then asked Grandmother, "Is there any other occasion that you observed [the Petitioner] molesting your granddaughter?" She responded, "No." However, Grandmother stated that she was curious how the Petitioner could have mistaken K.T. for her, given the difference in their sizes. She also testified that K.T.'s mother ("Mother") did not like the Petitioner when Grandmother started dating him.

The Petitioner testified on his own behalf that the incident at Grandmother's apartment was not a sexual advance because he was asleep and awoke to find his hand "being supported by the elastic" of K.T.'s panties. The Petitioner also stated that he and Mother did not get along. He stated that every time he was around Mother, she would ask him for money.

K.T. also testified about a different occasion in which she went with Grandmother to spend the night at the Petitioner's house. She stated that the Petitioner stuck his "hot dog" in her "monkey"[3] and in her mouth and ejaculated both times. According to K.T., this incident occurred in the Petitioner's daughter's room while Grandmother was in the shower. K.T. testified that the Petitioner did the same thing to her the next day.

On cross-examination, K.T. testified that she stayed at the Petitioner's house for seven days and that he molested her every night. She stated that the Petitioner handcuffed her feet and arms to his daughter's bed during the incident at his house. She acknowledged that she cannot tell time on a clock, but she thought that Grandmother was in the shower for about one or two hours. K.T. testified that she screamed during the incident but that the Petitioner had taped her mouth shut. She stated that she chewed through the tape and screamed, which was when Grandmother came into the bedroom and observed the incident. However, K.T. testified that Grandmother did not say anything when she saw what happened. According

---

[3] K.T. also acknowledged to the State that the other term she used for her "private part" was her "kitty cat."

to K.T., Grandmother "was on [the Petitioner's] side for a couple of days and then she was on [K.T.'s] side where she is today."

On redirect examination, K.T. stated that there was not a clock in the Petitioner's daughter's bedroom and that she did not know how long one or two hours is. On recross examination, she stated that she might have been at the Petitioner's house in April but that it was in the fall and that it was hot outside.

Grandmother testified that K.T. went with her to the Petitioner's home for the weekend sometime around April 9th, 2006. However, during cross-examination, Grandmother stated that the weekend in question was sometime around August, not April of 2006. According to Grandmother, the Petitioner spent much of the weekend in his camper working with his C.B. radio equipment, and K.T. spent most of that weekend in the spare bedroom playing and watching television. Grandmother stated that, at some point during the stay at the Petitioner's house, she took a shower for fifteen minutes. She indicated that the Petitioner was in his camper and K.T. was in the spare bedroom watching cartoons and playing on the floor before and after her shower. According to Grandmother, she never observed the Petitioner touch K.T. that weekend except to kiss her on the forehead. Furthermore, she stated that the only time that weekend in which the Petitioner and K.T. could have been alone other than when she was in the shower was Friday night when Grandmother rested on the couch for awhile.

The Petitioner testified that the only weekend in which K.T. stayed at his house was the weekend of April 9th, 2006. The Petitioner stated that he did not remember a time that weekend when Grandmother was in the shower because he spent most of the weekend outside in his trailer working with his radio equipment. He stated that he did own a pair of handcuffs but that he kept them locked in his bedroom. When asked if he ever made any sexual advances toward K.T., the Petitioner answered "absolutely none."

Both parties stipulated to Dr. Lisa Piercey as an expert in the medical field with a specialty in pediatrics. Dr. Piercey testified that she was asked to conduct a medical examination of K.T. following allegations of sexual abuse in September of 2006. She stated that, in addition to the medical examination, she interviewed Mother and K.T. regarding those allegations. In that interview, Dr. Piercey indicated that she learned that K.T. "had had vaginal penetration by both a penis and a finger, anal penetration by a finger and oral sex." She stated that K.T.'s exact words were that "'[the Petitioner] put his weiner in her kitty cat.'" Dr. Piercey testified that the physical examination revealed an "abnormal hymen exam." She stated,

We look at the hymen. It comes in all different shapes and forms. Her's had a classic appearance for a child her age except that a portion– if I may, we describe the hymen like a clock, like the base [sic][4] of a clock, and anything that is abnormal below the 3:00 and 9:00 positions is considered abnormal meaning you're probably not born that way . . . . She had complete absence of the hymen from the 3:00 to the 5:00 position.

Based on the information provided by K.T. and the medical examination, Dr. Piercey testified that her diagnosis of K.T. was sexual abuse.

On cross-examination, Dr. Piercey stated that she learned during K.T.'s interview about an eight-year-old boy who had also touched K.T.'s "kitty cat." Dr. Piercey testified that K.T. gave no further details and did not want to talk about the incident. When asked whether a child could injure themselves in the way she observed on K.T.'s body, Dr. Piercey responded that, although it is possible, it is highly unlikely for a pre-pubescent child to do such a thing because doing so would be extremely painful. Dr. Piercey testified that K.T.'s injury had healed, meaning that the injury was at least two weeks old at the time of the examination. Dr. Piercey stated that it was impossible to determine how much time had passed from the time of the trauma to the time of the examination. When the State asked Dr. Piercey about K.T.'s sexual knowledge, she stated that it was outside the normal range of most five-year-olds, indicating some sort of sexual exposure.

On redirect examination, Dr. Piercey testified about her conversation with Mother regarding the incident with an eight-year-old boy. Dr. Piercey stated that, according to Mother, the boy got on top of K.T. with his clothes on, but there was no penetration, and, after investigation by Mother, the situation turned out to be "nothing." Mother testified that, two years prior to trial, she walked in on the boy and K.T. but that the two children were fully clothed. She stated that K.T. had a medical examination at a clinic shortly thereafter which revealed no evidence of sexual contact.

Investigator Anthony Woodfin of the Henderson County Sheriff's Department testified regarding his involvement in the investigation of the allegations against the Petitioner. Investigator Woodfin initially stated that he sat in on the forensic interview with K.T. However, on cross-examination, he acknowledged that it was actually a different investigator, Investigator Dowdy, who was present at the time of the forensic interview with K.T. Investigator Woodfin indicated that the forensic interview took place in September of 2006, and he did not become an investigator until December of 2006. He stated that he read the transcript from the forensic interview and that the transcript, combined with the

---

[4] It seems as though Dr. Piercey was discussing the "face" and not "base" of a clock.

information gathered from the doctor's report, provided probable cause to file charges against the Petitioner. Investigator Woodfin visited both places that the incidents allegedly occurred, i.e., the residences of Grandmother and the Petitioner. He stated that Grandmother's house only had one bedroom and one bed.

Trial counsel called Michelle Valdez from DCS as a witness at trial. He asked Valdez if she had "personal knowledge as to who made the initial contact with [DCS]." Valdez responded that Dr. Jonathan Lentz referred the case to DCS. Valdez indicated that she and Investigator Dowdy were present at the time of the forensic interview and observed it from closed circuit television. She stated that Mother was not present for the forensic interview and that there was no mention in that interview of an incident with an eight-year-old boy. On cross-examination, Valdez testified about her preliminary interview with K.T. and Mother. Valdez stated that, according to K.T., the Petitioner touched K.T.'s "private part." Valdez testified that she terminated the session at that point in order to set up the forensic interview so that K.T. would only have to tell her story once. Valdez also testified that,

> [K.T.] disclosed at the forensic interview that [the Petitioner] touched her kitty cat and her butt with his finger and his tongue. He touched her kitty cat on the inside. He touched her butt with his tongue on the inside. This happened at his house. He told her that she should not tell anyone or he would kill her.

Mother testified that she took K.T. to a check up before school started in August of 2006. At that check up, Mother indicated that K.T. told Dr. Lentz about being molested by the Petitioner and Dr. Lentz reported that information to DCS. Mother stated that she called Grandmother upon learning about the molestation, and Grandmother adamantly denied that the Petitioner injured K.T. in that way.

After deliberation, the jury returned guilty verdicts for one count of rape of a child and one count of aggravated sexual battery. The jury found the Petitioner not guilty on two counts of rape of a child, and the court declared a mistrial as to the two remaining counts of rape of a child. The Petitioner's convictions were affirmed on direct appeal. See State v. Michael Vincent Ricco, No. W2008-00756-CCA-R3-CD, 2009 WL 2191872 (Tenn. Crim. App. July 23, 2009), perm. app. denied, (Tenn. Dec. 14, 2009).

Captain Anthony Woodfin[5] testified at the post-conviction hearing regarding his testimony at trial as an investigator. He stated that a different investigator worked on the Petitioner's case before he had taken it over. Captain Woodfin indicated that he did not speak to K.T. but that he did speak with Mother and Grandmother. He acknowledged that, although he initially testified at trial that he was present for the forensic interview of K.T., he in fact only read the transcript of the interview. Captain Woodfin testified that he read all information included in the case file pertaining to the Petitioner's case before testifying at trial. He stated that he could not recall whether trial counsel ever tried to contact him prior to trial.

Trial counsel testified that he interviewed Grandmother and spoke with her on several occasions. He acknowledged that Grandmother related to him the story about the Petitioner putting his hand down K.T.'s panties and that he knew that story would come out at trial. Trial counsel stated that he did not remember who was present for K.T.'s forensic interview but that he would have known that detail at the time of trial. He stated that he was aware at the time of trial that Captain Woodfin testified to information about which he lacked personal knowledge. Trial counsel testified that he might not have objected to such testimony, but that he at least would have drawn attention to Captain Woodfin's lack of personal knowledge. He acknowledged that the situation presented an objection to raise.

Trial counsel also discussed his decision to subpoena Valdez from DCS to testify at trial. He testified that obtaining any information from DCS prior to trial was very difficult, saying, "I actually sent letters to [DCS] trying to get some information which I was never able to get." Trial counsel stated that, when he asked Valdez who made the referral to DCS, he did not know at that time that the referral came from Dr. Lentz. He acknowledged that the forensic interview of K.T. was damaging to the defense and that the State had rested its case without presenting the information from the interview. When asked about his attempts to contact Valdez prior to trial, trial counsel testified, "I called her and actually subpoenaed them to testify and they made an effort not to even participate even on the day of trial. They tried to avoid testifying at all and I insisted that it was absolutely necessary. They really don't give you any direct information."

The State asked trial counsel why he decided to call Valdez as a witness and if that reason related to his case theory. Trial counsel responded,

---

[5] Between the trial and the post-conviction hearing, Anthony Woodfin was promoted from the position of Investigator to Captain.

[i]t was my understanding there was some ill feelings between [Mother] . . . and [the Petitioner] and there had been some confrontation there because apparently when he moved in, she felt offended by him and I thought she may have created and drummed up some charges on him. That's what I was trying to find out.

Trial counsel stated that the Petitioner was aware of this reason for calling Valdez and that the Petitioner had in fact believed the referral to DCS came from Mother. Trial counsel acknowledged that Mother refused to speak with him before trial, but he called her to testify at trial in order to elicit testimony about the incident K.T. had with the eight-year-old boy.

When asked why he posed a question to Grandmother that would elicit the story of the Petitioner having his hand in K.T.'s panties, trial counsel responded,

[b]ecause he admitted all along during our discussion that that accident happened and she had told us about that and my argument for that was that there may have been some inappropriate touching. I really wanted that to come out because there was a good possibility he could be, if anything, found guilty of something less than rape of a child. That was my purpose for bringing it out.

The Petitioner's counsel then asked trial counsel whether he used a poor choice of words when he asked Grandmother, "[i]s there any other occasions [sic] that you observed [the Petitioner] molesting your granddaughter?" Trial counsel stated,

[a]bsolutely not. She was the one that I had talked to and she shared with me that she had been with him and around him and other than that incident where he put his hands down there in all the times the child had been around him, I wanted the jury to hear that on no occasion had she observed that and they had spent considerable time together.

The State recalled Captain Woodfin, and Captain Woodfin stated that the extent of the prior investigator's involvement in the case was mainly his presence at the forensic interview. Captain Woodfin testified that, other than the forensic interview, he did the majority of the work on the case. He stated again that he interviewed Mother. However, on cross-examination, Captain Woodfin acknowledged that he, in fact, did not speak with Mother. He then stated, "[i]t could have been a brief conversation, but I believe I did speak with her at some point. I know definitely after I was involved in it, yes."

The Petitioner chose not to testify at the post-conviction hearing. No other witnesses were called. The post-conviction court dismissed the Petitioner's Petition for Post-Conviction Relief, holding that the Petitioner failed to prove either prong of his ineffective assistance of counsel claim. The Petitioner timely appealed the decision of the post-conviction court, claiming that he was denied effective assistance of counsel based on trial counsel's failure to interview and investigate the testimony of Captain Woodfin, Valdez, and Mother prior to trial.

## Analysis

### *Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is *de novo* with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[6] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.

---

[6] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Act. See Tenn. Code Ann. § 40-30-103 (2006); Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). The petitioner's failure to establish either prong by clear and convincing evidence is fatal to his or her claim of ineffective assistance of counsel. Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006). Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)).

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our Supreme Court has explained that:

> the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)).

When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell, 185 S.W.3d at 326 (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991).

We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). Thus, "when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel." Hellard, 629 S.W.2d at 9 (quoting U.S. v. DeCoster, 487 F.2d 1197, 1201 (D.C. Cir. 1973)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The Petitioner argues that trial counsel failed to thoroughly investigate Captain Woodfin's testimony and failed to communicate with Valdez and Mother before calling them as witnesses. The Tennessee Supreme Court has recognized a non-exhaustive list of expectations for counsel promulgated by the American Bar Association Standards for the Defense Function. Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006). The third criterion is at issue in the case at bar:

> (3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed . . . . This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the Government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

Id. (quoting Baxter, 523 S.W.2d at 933); State v. Taylor, 968 S.W.2d 900, 905-06 (Tenn. Crim. App. 1997) (quoting DeCoster, 487 F.2d at 1203-04). However, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Cauthern v. State, 145 S.W.3d 571, 604 (Tenn. Crim. App. 2004) (quoting Strickland, 466 U.S. at 691); see also State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999).

-11-

## Captain Woodfin's Testimony

The Petitioner asserts that trial counsel failed to properly investigate the involvement of individuals within the Sheriff's department in the investigation of this case. The Petitioner points to the fact that trial counsel failed to object when Captain Woodfin testified on direct examination that he sat in on K.T.'s forensic interview when it was actually a different investigator who was present. However, trial counsel elicited twice on cross-examination from Captain Woodfin that he in fact was not present for the forensic interview. Although trial counsel agreed that he could have made an objection on direct examination when Captain Woodfin said he was present for the interview, the Petitioner has failed to show that trial counsel's waiting until cross-examination was outside the scope of a reasonable trial strategy.

The Petitioner argues in his brief that Captain Woodfin's testimony about the forensic interview was "inadmissible hearsay" and that, had trial counsel investigated to ascertain who was actually present for the interview, he could have objected to the admission of the testimony. However, Captain Woodfin did not testify about the contents of or the statements made at the forensic interview, so any hearsay argument is fruitless. See Tenn. R. Evid. 801(c).

As to the second prong, even if trial counsel failed to thoroughly investigate whether or not Captain Woodfin was present at the forensic interview, once again, trial counsel twice sought and obtained Captain Woodfin's admission that his prior testimony was wrong and that he was not present. The Petitioner states in his brief that "[c]omplete investigation would have . . . allowed trial counsel to have the testimony either excluded or extremely discounted in the eyes of the jury." The jury had the opportunity to take into consideration Captain Woodfin's admission when determining his credibility as a witness, and, therefore, trial counsel gave the jury the opportunity to "extremely discount[]" his testimony. Thus, there is no prejudice.

Therefore, because the Petitioner has not proven deficient performance on the part of trial counsel in regards to the investigation of Captain Woodfin or any prejudice suffered, he is entitled to no relief on this basis.

## Calling Valdez and Mother as Witnesses

The Petitioner next asserts that trial counsel performed deficiently by failing to communicate with Valdez or Mother prior to calling them to testify at trial. The Petitioner states that "[t]he failure of [trial] counsel to even attempt to gather information about

witnesses to be called at trial[] is on its face deficient representation." We will first address the Petitioner's contention that trial counsel failed "to even attempt to gather information."

At the post-conviction hearing, trial counsel explained that his trial strategy was to show that Mother "may have created and drummed up some charges on [the Petitioner]." Trial counsel indicated that the Petitioner believed Mother took the case to DCS because of her "ill feelings" toward the Petitioner. Trial counsel thus chose to call Valdez in order to find out who made the referral to DCS. He indicated that he made various attempts to contact Valdez prior to trial but that DCS would not respond to his requests. At trial, before Valdez gave any testimony involving K.T.'s case, Valdez gave a statement to the trial judge that read, "if allegations of sexual abuse are involved, [Tennessee Code Annotated §] 37-1-409 and [Tennessee Code Annotated §] 37-1-612[] provide[] that it is illegal for me to reveal any of my records in this case . . . except for purposes directly related to the administration of Tennessee child abuse laws." The trial judge then granted Valdez permission to testify regarding her findings from K.T.'s case file.

Trial counsel also attempted to contact Mother but was unable to speak with her before trial because "she refused to talk with [him]." Although she refused, he stated that he decided to have her testify in order to ask her about the incident with K.T. and the eight-year-old boy as well as "how she had been living from house to house."

This Court has held that "[a]lthough [Tennessee Code Annotated § 37-1-612(b)(1)-(7)] identifies exceptions to the prohibition against production of child sexual abuse reports, . . . production to individuals accused of child sexual abuse is not among the exceptions." State v. Biggs, 218 S.W.3d 643, 662 (Tenn. Crim. App. 2006) (citing Tenn. Code Ann. § 37-1-612 (b)(1)-(7) (2006); State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997); State v. Clabo, 905 S.W.2d 197, 201 (Tenn. Crim. App. 1995)). Furthermore, our statutes provide that:

> [t]he name of any person reporting child sexual abuse shall in no case be released to any person other than employees of the department or other child protection team members responsible for child protective services, the abuse registry, or the appropriate district attorney general upon subpoena of the Tennessee bureau of investigation without the written consent of the person reporting.

Tenn. Code Ann. § 37-1-612(g) (2006). The American Bar Association's standards, recognized by Tennessee's Supreme Court, state that "a defense attorney, or his agent, should interview not only his own witnesses but also those that the Government intends to call, *when they are accessible*." Vaughn, 202 S.W.3d at 116 (quoting Baxter, 523 S.W.2d at 933).

-13-

Based on the fact that Valdez was unwilling to reveal any information without the express mandate by a court, trial counsel was unable to obtain that information from Valdez before trial. Furthermore, the Petitioner believed that Mother referred the case to DCS, and he knew trial counsel would call Valdez to elicit that information. Additionally, despite trial counsel's attempts, Mother also refused to speak with him prior to trial.

We recognize that trial strategy is only sound when the basis of that strategy is adequate preparation. See Cooper, 847 S.W.2d at 528. However, trial counsel's failure to speak with Valdez and Mother before calling them as witnesses at trial is not "on its face deficient representation" as the Petitioner contends. Rather, the record reflects that trial counsel called these witnesses after attempting to speak with them for the purpose of furthering the defense strategy. Moreover, in looking at the prejudice prong, we find that there was ample evidence of the offenses before the jury in the absence of the testimony of Valdez or Mother.

The Petitioner argues that trial counsel should not have called Valdez to ask who referred the case to DCS because it provided an independent source[7] to add credibility to the testimony of the State's witnesses. The Petitioner also asserts that calling Valdez as a witness without proper investigation was detrimental to the Petitioner's case by opening the door for the State to introduce the contents of K.T.'s forensic interview on cross-examination. However, the State did not enter the transcript from the forensic interview into evidence, and Valdez merely relayed a broad summary of K.T.'s account of the incidents, which the jury had already heard at greater length and detail from K.T. herself. Furthermore, even without testimony about the referral from Dr. Lentz, the jury already had before it the testimony from Dr. Piercey, who testified regarding the physical evidence of sexual abuse. Valdez's testimony shed no light onto what Dr. Lentz actually knew or any conclusions that he made.

Regarding the decision to call Mother to testify, the Petitioner has failed to identify anything from Mother's testimony that was prejudicial to the Petitioner's case. Furthermore, Mother's testimony merely provided further explanation for incidents to which other witnesses had already testified at trial.[8] Much like the analysis pertaining to Valdez, had trial counsel not called Mother to testify, the jury had previously heard Dr. Piercey's testimony about her medical examination of K.T. and K.T.'s firsthand account of sexual abuse by the

---

[7] The independent source was the referral that Dr. Lentz provided to DCS.

[8] The incidents to which Mother testified were not the actual instances of alleged sexual abuse of the Petitioner. Mother testified to the incident in which K.T. disclosed to Dr. Lentz about the alleged sexual abuse, the incident in which she walked in on K.T. with the eight-year-old boy, and her interaction and relationship with both Grandmother and the Petitioner.

-14-

Petitioner.  Therefore, there is not a reasonable probability that, had trial counsel not called Mother, "the result of the proceeding would have been different."  <u>Vaughn</u>, 202 S.W.3d at 116 (citing <u>Strickland</u>, 466 U.S. at 694).

Consequently, the Petitioner has failed to establish that trial counsel's performance regarding the decision to call Valdez and Mother as witnesses was deficient or that the Petitioner suffered prejudice as a result of that decision.  Therefore, the Petitioner is entitled to no relief on this basis.

## Conclusion

The Petitioner has failed to prove his ineffective assistance of counsel claim by clear and convincing evidence.  We therefore affirm the decision of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE